## Case No. 15,641.

### UNITED STATES v. LUMSDEN et al.

[1 Bond, 5.] [1]

Circuit Court, S. D. Ohio.   Feb. Term, 1856.

NEUTRALITY LAWS—OVERT ACT—PROVIDING MONEY —EVIDENCE—PRELIMINARY EXAMINATION.

1. An examining court or judge will not require clear and indubitable proof of the guilt of accused parties, to justify an order that they shall answer further to the charge made against them.

2. Section 6 of the neutrality act of April 20, 1818 [3 Stat. 449], punishing the offenses of beginning or setting on foot, or providing or preparing the means for a military expedition or enterprise for the invasion of a country with which the United States is at peace, is not violated without the commission of an overt or definite act.

3. Mere words written or spoken, though indicative of the strongest desire and most determined purpose to do the forbidden acts, will not constitute an offense defined and punished by said section 6

4. If the means provided were procured to be used on the occurrence of a future contingent event, no liability is incurred under the statute.

5. If the intention is that the means provided shall only be used at a time and under circumstances when they could be used without a violation of law, no criminality attaches to the act.

6. To provide the means for such unlawful expedition or enterprise implies that such means must be actually furnished and brought together for a criminal purpose.

7. Proof of declarations made by a defendant is admissible to explain or determine the character of acts ambiguous or unintelligible.

8. Written and printed evidence containing no proof of an overt act, in violation of said section 6, is admissible as confessions and declarations, and to such evidence the rule applies that those parts which admit of an interpretation favorable to defendants must be considered as well as those justifying the implication of guilt.

[This was a preliminary hearing in the case of Samuel Lumsden and 12 others, charged with setting on foot and providing the means for a military expedition against the people of Great Britain, in violation of section 6 of the act of congress of April 20, 1818 (3 Stat. 447).]

Corwin & Probasco and Geo. R. Sage, for the United States.

Groesbeck, Piatt, Mallon & O'Neill, for defendants.

LEAVITT, District Judge.   The evidence in this case being closed, after a very protracted examination, it is my duty to state the grounds of the order I propose to make.

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

And I may premise, that sitting as an examining judge, the sole inquiry is, whether the evidence offered, and the law applied to it, make out such a probable case of guilt as will require the accused persons to answer further to the charge exhibited against them.   In stating the conclusion to which I have arrived, it is not my purpose to notice at length all the facts adduced in evidence, or the numerous points made by counsel, in the extended discussion of the case.   The duty I am to discharge is purely of a judicial character, and will be performed without any reference to popular opinion, or any outside pressure, which it is alleged has been brought to bear on the case.   I should be utterly unworthy of the position I occupy, if these considerations could have the slightest influence on my action.

It is undoubtedly a sound and well-settled rule, that an examining court or judge will not require clear and indubitable proof of the guilt of accused parties to justify an order that they shall answer further to the charge made against them.   Whether thus held, or whether discharged unconditionally, the order is not conclusive.   In the former case, the accused is remitted, first, to a grand jury for an inquiry into the facts; and it is only on their affirmation of the charge, by the return of a bill of indictment, that the party can be put on trial before a traverse jury.   On the other hand, if the accused party is discharged by the examining officer, it is no bar to a subsequent prosecution for the same charge.   If, however, after a full examination of the facts, the court or judge is satisfied, as a fair legal deduction, that no crime has been committed, it is his duty promptly to order the discharge of the party accused.   It is the right of the party at once to be relieved from a position involving a suspicion of crime, which may seriously affect, not only his social standing, but his pecuniary interests.   And it may be remarked that the healthful and efficient administration of criminal law is not promoted by prosecutions which, in the last resort, fail to produce the conviction of the person accused.   As a general rule, such futile prosecutions tend more to the encouragement than the repression of crime.

The affidavit on which the warrant in this case issued was made on the 4th of January last.   Twenty persons were included in the affidavit and warrant, of whom thirteen, namely, Samuel Lumsden, Joseph W. Burke, Edward Kenefeck, Bartholomew O'Keefe, David Reidy, Michael Noonan, James Murphy, James O'Halleron, John Hudson, Thomas Tiernan, William G. Halpin, Daniel Campbell, and John M. C. McGroarty, were arrested.   The last-named person, on the motion of the counsel for the defense, and by the consent of the counsel for the prosecution, was discharged at an early day in the progress of this examination.   The other

twelve are now before the court. They are all natives of Ireland, but naturalized citizens of the United States.

The complaint on which the warrant issued was sworn to by John Powers, a citizen of the United States; and sets forth that the persons named therein, "on or about the 28th day of December, 1855, at the city of Cincinnati, in the Southern district of Ohio, and at divers other times and places within said district, to wit: at sundry times since the 1st day of May, 1854, and at the city of Hamilton, and the town or village of Cumminsville, in said district, did begin and set on foot, and did provide and prepare the means for one military expedition or enterprise, to be carried on from thence against the territory and people of Great Britain, with whom the United States were, and now are, at peace."

It is a fact developed in the progress of this examination, that although the affidavit, on which the warrant is based, was made by Powers, a citizen of the United States, the Hon. Charles Rowcroft, her Britannic majesty's consul at Cincinnati, has had an active agency in this prosecution. This has been frankly admitted by that gentleman, in the presence of the court. He has advanced a large amount of funds in procuring evidence to sustain the prosecution, and has, in other ways, given it his sanction and support. This has been made the occasion of an assault on Mr. Rowcroft, by the counsel of the accused, characterized by great bitterness and severity. While I can not but regret that the obligations of courtesy were not more closely adhered to by counsel, the position of the gentleman named in relation to the prosecution afforded some palliation, certainly, for the course pursued, and rendered it improper for the court to interpose for his protection. But whether he has or has not transcended his legitimate sphere of official duty in this case, is not a question for the consideration of the court; since its action must depend, not on the conduct of the British consul, but on the facts in evidence and the law applicable to them.

With these remarks, I proceed to the inquiry, whether the facts proved establish the legal probability of the guilt of the accused parties. The charge against these defendants is based upon section 6 of the act of congress of April 20, 1818 (3 Stat. 447). It declares "that if any person shall, within the territory or jurisdiction of the United States, begin or set on foot, or provide or prepare the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, or of any colony, district or people, with whom the United States are at peace, any person so offending, shall be deemed guilty of a high misdemeanor, and shall be fined not ex-

ceeding three thousand dollars, and imprisoned not more than three years."

In the progress of the argument, frequent references were made to the early executive and legislative history of the country, illustrative of its policy respecting the preservation of its relations with foreign powers with whom we were at peace. In the year 1794, during the second administration of Washington, the attention of congress was earnestly called to this subject, by the arrogant interference with our national affairs of a diplomatic agent of the French government, threatening to disturb our amicable relations with Great Britain. As the result of this, the law of 1794 [1 Stat. 381], was enacted. After some intermediate legislation on this subject, the act of 1818 was passed, repealing all former laws, and embodying in it most of the provisions of the previous acts. Section 5 of the law of 1794 was transferred to, and became section 6 of the act of 1818, before quoted.

In construing this section, the court is not essentially aided by previous judicial decisions. Of the few reported cases arising under it, none seem to have involved the precise questions now before the court. They were decided with reference to the facts in proof, but these facts were of such an unequivocal character as to leave little room for doubt that they were overt acts, and were sufficient to justify the conviction of the persons implicated, under the section referred to. But they do not furnish an answer to the inquiry arising in this case, namely, whether the circumstances in proof constitute the offenses of beginning, or setting on foot, or providing or preparing the means for, a military expedition or enterprise, designed to invade a country with which the United States is at peace.

No proposition can be clearer than that some definite act or acts, of which the mind can take cognizance, must be proved to sustain the charges against these defendants. Mere words, written or spoken, though indicative of the strongest desire and the most determined purpose to do the forbidden act, will not constitute the offense. It is true that proof of declarations of this nature, previously made, is admissible to explain or determine the character of acts, otherwise ambiguous or unintelligible; but for any other purpose they have no pertinency.

The language of the section is clear and perspicuous; and yet, as in most statutory enactments, it is referred to judicial discretion to determine what acts shall bring a party within its prohibitions, and incur the guilt of its violation. This discretion, however, must not be arbitrarily exercised, but it is to be controlled by known and well-settled rules of construction. One of these rules, applicable to all penal statutes, is, that they must be construed strictly, and not be so extended in their scope as to

include cases not clearly within their terms.

In the case of U. S. v. O'Sullivan [Case No. 15,975], to which reference is made in Whart. Cr. Law, 905, and which has been commented upon by several of the counsel in this case, the learned Judge Judson gives a very clear exposition of the section under consideration. Adopting his views, I will quote some passages from his opinion. It should be premised, however, that the facts involved in the case, tried before Judge Judson, are not given by Mr. Wharton in his reference to it; and I do not know the precise case before the court, to which the views stated by the judge were intended to apply. A knowledge of these facts would doubtless make his analysis and exposition of the section more satisfactory and intelligible. I will, however, give some brief extracts from the elaborate opinion referred to. In the first place, the learned judge says: "Before the jury can convict on this indictment, it must be proved to their satisfaction that the expedition or enterprise was in its character military; or, in other words, it must have been shown, by competent proof, that the design, the end, the aim, and the purpose of the expedition or enterprise, was some military service, some attack or invasion of another people or country, state or colony, as a military force." This remark presupposes that some proof has been adduced that an expedition or enterprise has been begun or set on foot, and is intended to instruct the jury in relation to what must be its character and purpose, in order to subject the defendants to the penalties of the law. He then proceeds: "To constitute a misdemeanor under the law of 1818, there must have been a hostile intention connected with the act of beginning or setting on foot the expedition." In a subsequent part of his charge, the judge defines the terms used in section 6 in these words: "The word expedition is used to signify a march or voyage with martial or hostile intentions. The term enterprise means an undertaking of hazard, an arduous attempt. Begin is to do the first act—to enter upon." And again: "To set on foot is to arrange, to place in order, to set forward, to put in the way of being ready. Then, to provide is to furnish and supply; and to procure the means is to obtain, bring together, put on board, to collect." And subsequently he remarks: "There are four acts declared to be unlawful, and which are prohibited by the statute: 'To begin an expedition, to set on foot an expedition, to provide the means of an enterprise, and, lastly, to procure those means.'" He then adds: "As an illustration of what has been said, I will remark that to purchase, charter, repair, or fit up any vessel or steamboat; to procure and put on board such vessel or steamboat powder, ball, firearms, military stores, ship stores, or any of them, to be used in any place in contravention of and with intent to violate this act; to enlist, engage verbally, or contract with men, as officers, soldiers, or musicians, to go out on such an expedition as I have defined—may be considered as providing and procuring the means of a military expedition or enterprise."

No authority can be necessary to sustain the position that the conclusion of guilt, in reference to any of the four alternative acts forbidden by section 6, follows only from proof of some distinctive, substantive fact looking to, and having for its object, a military expedition or enterprise against a country with which our relations are peaceful. Even as to the first and lowest form of offense designated by the statute—that of beginning a military expedition or enterprise—it must be signalized by some overt act. It is true, as to this offense, the statute is very comprehensive in its terms, and was evidently intended to strike at the first inception of any movement which, in its development, might endanger the peace of the country. Still, the beginning to do a thing imports that there must be an act which marks such beginning. It is difficult to form a clear conception of what will constitute such inceptive act. As before intimated, it requires something beyond a mere declaration of an intention to do it. The actual enlistment or enrollment of men, with the purpose of engaging in an unlawful military expedition or enterprise, is clearly within the scope of the first alternative of section 6. This constitutes a substantive fact susceptible of proof; and being proved, would justify the conclusion of legal guilt. It is not material, in this case, to inquire whether the overt act of beginning an unlawful military expedition or enterprise may not be consummated prior to an actual enlistment or enrollment of men, by some act of a less equivocal character. Probably a previously concerted movement or arrangement, with a distinct reference to the recruitment of men, would be sufficient to constitute such a beginning. And if this was followed up by the designation of a plan for an enlistment or enrollment, though there should be no proof that any were actually enlisted or enrolled, it would bring the parties implicated within the operation of the section referred to.

But in the view I have taken of the evidence in this case, it is quite unnecessary to consider more critically and minutely the import and construction of section 6. I will proceed, therefore, without further reference to it, very briefly to notice such parts of the evidence before me as bears on the question of the guilt of these defendants in reference to the charges exhibited against them. And 'n the first place, I will refer to the documentary or written and printed proofs before the court. These have been put in evidence by the prosecution, and it has been strenuously and forcibly insisted

that they show the existence of societies and organizations among the Irish population of this country, the members of which are actuated by strong hostility to the government of Great Britain, and avow it as their purpose and desire to free their native land from British rule, and eventually to establish its independence. It is contended that in the furtherance of this design movements are in progress, with which these defendants are connected, which threaten to interrupt our peaceable relations with Great Britain, and which call loudly for the vigilant enforcement of the neutrality laws of the United States.

The written and printed evidence, it may be remarked, contains no proof of any overt act in violation of the statute, and is competent so far only as it may be supposed to give character to those acts of the defendants which have been proved by the oral testimony. It is competent, in the light of admissions and declarations by which the defendants are bound; and viewed in this aspect, the well-known rule applies that it must be taken together, and those parts which admit of an interpretation favorable to the defendants must be considered, as well as those justifying the implication of guilt. The first item of this documentary proof is the book containing the constitution and minutes of the proceedings of the Robert Emmet Club of Cincinnati, which is a branch of the Irish Emigrant Aid Association of Ohio. The defendants are all members of this club. It is a secret society, every member being required to take originally an oath—now a promise—whereby he pledges himself, in the presence of God, that he "will persevere in endeavoring to form a brotherhood of affection among Irishmen of every religious persuasion," and that he "will also persevere in his endeavors to uproot and overthrow English government in Ireland." Then follows an obligation to the effect that, under no circumstances, shall the member disclose the doings of the club, or inform on, or give evidence against, any one belonging to it, etc. It is also in evidence that the club have secret signs or passwords, by which the members are known to one another, and by which they obtain admission to any similar society elsewhere. In their constitution they avow, as one purpose of the organization, the subversion of the British power in Ireland. They also adopt the platform of the Massachusetts society, which has been in existence something more than a year. In that platform there are strong expressions of hostility to England, and of a desire to liberate Ireland from her power; and it avows a determination to pursue a course of action "perfectly consistent with our duty and obligations to America, but tending to ensure the success of the cause of liberty in our native land." One of the resolutions forming a part of this platform recommends a convention to be held in New York, "for the purpose of carrying out a united system of action throughout the Union and the colonies, and to adopt an address to our brethren in Ireland exhorting them to be of good cheer, for their friends in America are up and doing, and that they shall not be left alone in the struggle."

The Cincinnati club was organized on the 4th of September last, and at the time of the arrest of these defendants numbered seventy-three members. By the constitution, every member upon his initiation, is required to pay one dollar, and afterward, twenty-five cents, monthly. A printed address, to the "Irishmen of the Buckeye State," dated the 27th of September last, issued in behalf of, and under the direction of this club, has been read in evidence. It is unnecessary to make quotations from it. It is a glowing and fervent appeal to Irishmen to co-operate with the Emmet Club in the purposes of its organization, by the formation of similar clubs throughout the state. And the object of these is avowed to be the achievement of the liberty and independence of Ireland. It does not, however, propose or recommend any course in violation of the neutrality laws of the Union. It was evidently written under the influence of high excitement, and its style is somewhat prurient and hyperbolical; but it does not advise or advocate any military movement in behalf of Ireland. What is said about grasping the liberty of that country with "a strong and armed hand," is evidently a mere figure of speech, and has no reference to any practical military action. Or if such a purpose was in the mind of the writer, he has failed to indicate any time at which it is to be fulfilled, or any specific action by which it is to be effected.

The address and resolutions of the convention of the delegates of the "American-Irish Aid Society," held at New York on the 4th of December last, have also been read in evidence, and referred to in the argument. Samuel Lumsden, one of the defendants, was a member of that convention, as a delegate from the Cincinnati society, and acted as one of its vice-presidents. The defendants, Halpin and Kenefeck, were also present as delegates. I have looked over the published account of the doings of that convention; and whatever views may be entertained of the utility and propriety of such a meeting, nothing appears in the proceedings indicative of an unlawful purpose to invade Ireland. While there are some expressions warranting the inference of such a design, upon certain contingencies, an intention to violate the laws of the United States is explicitly disavowed. One of the resolutions declares "that the first duty of all American citizens, whether native born or naturalized, of whatever political opinions, or of whatever nationalities, is to faithfully respect all their obligations of citizenship,

arising under the laws and constitution of our country."

But it is quite unnecessary to multiply references to these published documents. It is certain that, giving them a construction the most unfavorable to these defendants and to the objects and purposes of these associations of Irishmen, they do not establish the charge exhibited against them, nor fix upon them the guilt of any violation of the laws of the land. They prove no overt act of military movement or organization, looking to an invasion of Ireland, and bringing them within the provisions of the act of 1818. It is equally clear that neither the book containing the record of the constitution and the proceedings of the Emmet Club of Cincinnati, nor any of the papers offered in evidence, show a breach of any of the criminal laws of the United States. Whatever may be thought of the rightfulness or policy of secret societies or organizations, under our form of government, and the practice of enforcing the supposed obligations of their members by solemn appeals to Deity, whether in the form of oaths or promises, it is certain there is no legal prohibition of such acts. Neither is there any law, state or national, forbidding assemblies of the people for any lawful purpose, or restricting the right of a free expression of opinion, either by speaking or writing.

As the result of the views thus indicated, it follows that these written or documentary proofs have no relevancy to the case upon inquiry, except as they may give character to the oral testimony adduced. And I now propose very briefly to consider this testimony, and to state the conclusions to which it leads. To facilitate this inquiry the evidence may be considered, first, as applicable to the charge of beginning or setting on foot a military expedition or enterprise; and second, procuring or providing the means for such expedition or enterprise.

It is insisted by the counsel for the prosecution that the charges under both these divisions are sustained by the evidence. Three witnesses have been sworn and examined by the prosecution, whose evidence is mainly relied on, so far as oral proof is concerned. These are Powers, Hughes, and Barber. Powers is a native of Pennsylvania. The only facts stated by him, material to notice, are that he was present at a conversation between the witness Barber and Reidy, one of the defendants, near the corner of Western Row and Ninth street, in Cincinnati, in which Barber, alluding to the fact that he had paid money upon his enrollment in a military company, said that the company was not the right one, and that he had been imposed on. Reidy then replied, the Washington battalion was all right, and was bound to go to Ireland. This witness was also outside of the house in which the Hamilton meeting was held, and could hear and see what took place, and testifies that the defendant Burke stated the object to be to form societies, and to collect aid and arms to uproot and overthrow the British government in Ireland, and that some arms and men had already gone. As the witness Hughes states nothing material, it is not necessary to refer specially to his testimony.

The principal witness for the prosecution is Barber. He is before the court under somewhat peculiar circumstances. He is an Irishman by birth. On the 24th of October, for the purpose, as he says, of exposing the doings of the Emmet Club, if he found its purpose unlawful, he became a member, and took the oath prescribed, and got possession of the secret signs and passwords. These he communicated immediately to Mr. Rowcroft, the British consul, with whom he conferred, and from whom he received, from time to time, the sum of one hundred dollars. He attended nearly all the meetings of the club, from the time of his entrance into it till these defendants were arrested. He made notes and memoranda of what transpired at those meetings, which he has used on his examination to refresh his memory. This witness has been bitterly assailed by counsel, and denounced as utterly unworthy of credit. Some of his statements on the stand have been directly contradicted, and in some of them he is corroborated by the minute-book of the club and by witnesses. It must be admitted that he is before the court under circumstances suited to create strong doubts of his credibility. It is not important to inquire whether, in so far as he has misstated any facts to which he has sworn, he has willfully and corruptly falsified the truth, or whether from some cause there may not be a perversion of his mental and moral powers, as the result of which he views some subjects through a distorted medium; and thus unconsciously, it may be, to himself, has received erroneous impressions as to the circumstances about which he testifies. However this may be, I am constrained to view his testimony with caution and distrust.

But it may be well doubted whether, if the testimony of Barber is accredited, as to all the facts he states, which are not contradicted by reliable witnesses, the charge against the defendants is sustained. I will advert very briefly, first, to such parts of his testimony as are applicable to the charge of beginning or setting on foot a military expedition or enterprise, premising, as already stated, that nothing short of a previously-concerted agreement or arrangement, or for an actual enrollment or engagement of men, for the purpose of a military invasion of Ireland, will sustain the charge. On this subject the substance of what Barber states is, that he enrolled himself in one military company, connected with the Emigrant Aid Society, called the "Independent Conohan Guards." The statement concerning this enrollment is exceedingly vague and indefinite.

The organization of this company was never perfected, nor is there any evidence that the purpose of getting it up was an expedition against Ireland. Barber also states that Captain Tiernan, one of the defendants, asked him to join a company he was raising to go to Ireland, and that he, Barber, gave Tiernan three dollars for his initiation fee, and five dollars toward buying his uniform. Barber also states that Reidy told him, Tiernan's company was a humbug, and would never go to Ireland, but that his would. This is all the evidence that I am now able to recall, relating to the enrollment of men. And it may as well be stated now that it is in proof by several very respectable and credible witnesses that the companies to which Barber refers were, or had been a part of the Ohio militia, and had no connection whatever with the Emmet Club, and that the enrollment of which Barber testifies had no reference to a military expedition to Ireland. It also appears that not more than two of the members of the club belonged to any of these companies. The statements of Barber, therefore, fail to make out the proof of an enrollment of men for any purpose in violation of the laws of the United States. As the charge of beginning a military expedition or enterprise is not sustained, the second alternative, that of setting on foot, falls with it, since, as already stated, that imports a stage in the proceeding, resulting from the prior act of beginning, and must be preceded by it.

I am brought now to the consideration of the inquiry, whether there is proof of the providing or procuring the means of a military expedition or enterprise. And I may state here, as a governing rule in the application of the evidence on this point, that any providing or procurement of means, to bring the party within the penal sanction of the law, must have reference to the use of such means, under circumstances that would render such use criminal in the eye of the law. If, therefore, the proof shows that means were procured, to be used on the occurrence of a future contingent event, no liability is incurred under the statute. The test of the criminality of the act is the intention; but if the intention is that the means provided or procured shall only be used at a time, and under circumstances in which they could be used, without a violation of any law, no criminality attaches to the act.

I will now inquire what the proof on this point is, according to the statements of Barber, and on the supposition that his testimony is credible. And first, I may remark, that this witness says, on his cross-examination, that he knows of no money paid, or arms procured, for the purpose of a military invasion of Ireland. But it is insisted that he proves a number of isolated facts, which, when brought together, sustain the charge of providing and procuring the means of a military expedition. I will advert very briefly to these facts. Barber says, Burke, one of the defendants, gave him a subscription paper to collect money to aid in purchasing arms or guns for the club to go to Ireland. Burke had previously shown him a shooting-iron, saying it would do good execution in Ireland, and that it was for his company, the Queen City Cadets. Barber also states that Kenefeck, one of the defendants, said at the Cumminsville meeting, that $5,000 could easily be raised for the expedition, and that 100,000 Irishmen would look well in the morning sun on Vinegar Hill. He also states that at a meeting of the Emmet Club, on the 9th of November, Kenefeck said his instructions from New York were to take arms from this city to Ireland, and that in reply, Lumsden remarked that there was no use in that, for they would be furnished with arms in Ireland. It also appears from Barber's evidence, that at one meeting of the club a proposition in regard to procuring arms was submitted and debated.

It does not appear, however, from any part of Barber's statements, that any funds were ever paid, or that any arms were ever purchased. If his evidence is accredited, there was a good deal of talk about raising money and procuring arms, but nothing was ever accomplished in regard to those objects. The facts referred to, therefore, do not prove the charge of providing or procuring any means for a military expedition or enterprise. But it is proved by Barber (and in this he is corroborated by the minute-book of the club), that the defendant, Samuel Lumsden, at the convention in New York, in December last, offered to subscribe $1,000 to a fund which it was proposed to raise in aid of the operations of those who were laboring for the independence of Ireland. The minutes of the club show that the thanks of the members were voted to Lumsden for his "munificent offer;" and it is argued that this fact not only implicates Lumsden in the charge of providing and procuring means for a military enterprise or expedition against Ireland, but that all the members who voted for the resolution of thanks made the act their own, and are therefore criminal. I remark, in the first place, that this was a mere offer to contribute money, made, probably, upon some condition which has not been, and never will be, complied with, and which is neither legally or morally binding on the party making it. Again, there is nothing in the evidence to show that the offer of the $1,000 had any reference to a military descent on Ireland, or any other unlawful purpose. But if it were a criminal act, it was committed in another judicial district, and, therefore, without the jurisdiction of this court. And as to the affirmation of the act by the vote of thanks, whatever might be its effect in a civil suit, in a criminal prosecution it can not be held to implicate the parties thus voting.

Without adverting more minutely to the evidence for the prosecution, I may state, as the result of my deliberation upon it, that I am led to the conclusion it does not sustain the charge against these defendants. But it is proper, however, in order that the whole case may be fully presented, that I should refer to some parts of the evidence adduced by the defense. And first, I refer to the testimony of Michael M. Keating, who says that he was one of the founders and first members of the Irish Emigrant Aid Association, and "its object was to unite old and new Ireland for one particular purpose, and that was to get up an American Fontenoy, in the event of trouble between America and England," and that they were careful to do nothing that would compromise them with this government, or this government with England. This witness heard Mr. Hyde make a stimulating speech to the club, in regard to the probability of a difficulty between the United States and England, and exhorting the members to be ready in that event to aid Ireland. He says, also, that the Emmet Club had nothing to do with any military organization as such.

J. J. Burns, a witness for the defendants, says he is a member of the Emmet Club, and that all the members have been absolved from the obligation of their oaths, so that they could testify freely in this case. He says he is a member of the Methodist Church, and that there is nothing in the principles or constitution of the Emmet Club to prevent a member of any Christian church from belonging to it. He was a regular attendant at the meetings of the club. The club has no connection with any military company. A proposition was once made in the club in relation to arms, but the president ruled it out of order. Nothing was ever said in the club about the present difficulties of England in the Crimea, or about taking advantage of the present difficulties between England and Russia. Edward Dalton testifies that at the Hamilton meeting Burke did not state that the object of the Irish society was to raise men and arms for the invasion of Ireland. He spoke of an invasion of Ireland, by the Irish of this country, in the event of a war with Great Britain. In this, he directly contradicts Barber.

In reference to the witnesses above named, it may be remarked, they are before the court without impeachment, and without any reason to suspect the truthfulness of their statements. The witness Burns, especially, from his manner in court, seems to be a man of more than ordinary intelligence; and it is not controverted that he occupies a highly respectable standing in this community. If the statements of these last-named witnesses are entitled to credence, the proof is clear that the club or association with which these defendants are connected, has not proposed or attempted any military movement, designed either presently or prospectively, for a descent on Ireland. The impracticability of an invasion of that country from the United States, while at peace with Great Britain, and the certainty that any such attempt would result in nothing but disaster to those engaged in it, affords a presumption, at least, that it was not seriously contemplated. And, if there existed in the minds of these defendants any ulterior purpose of such hostile demonstration against that country, it was to be carried out only upon the occurrence of a state of war, and would therefore involve no violation of law.

I have thus hastily noticed what seem to be the material parts of the evidence submitted to the court. Many facts have been developed by the testimony, which are not important, as applicable to the present inquiry. That inquiry is not whether these defendants harbor feelings of deep-rooted hostility to England, and a too ardent desire for the redress of the alleged wrongs of Ireland —not whether, as the result of the almost proverbial warmth and excitability of the Irish temperament, they have been imprudent, or indiscreet in words or actions—not whether their efforts to excite the zeal of their countrymen in the United States may or may not, in its results and developments, prove beneficial to the land of their birth—but whether, from the evidence, there is reasonable ground for the conclusion, that they are guilty of the specific charges against them, or of any other criminal violation of law.

I approve cordially of the policy of our national legislation, for the preservation of our neutral relations with foreign countries, with which we are at peace. It had its origin at an early period of our history, and in the best days of the republic. It was adopted upon the recommendation of Washington, the sanction of whose great name is quite sufficient to commend it to the profoundest regard of every right-hearted American citizen. It has its basis in the incontrovertible truth, that our great country will best subserve its true interests, and attain its highest glory, by avoiding all "entangling alliances" and hostile conflicts with other nations. While we may desire, and by all legitimate modes of action, labor for the political regeneration of every oppressed people, and the universal diffusion of the principles of our free government, we should bear in mind that our mission is, emphatically, one of peace. We are not called upon to proclaim and enforce the great doctrines, which lie at the foundation of our incomparable institutions, at the cannon's mouth, and "with garments rolled in blood." It should rather be our high purpose to recommend their recognition and adoption by other nations, by our elevated and enlightened course of action, and by showing with what scrupulous regard the rights and liberties of the people are protected and maintained. It is thus that we shall successfully demonstrate the great truth, that man is capable of self-government, and that constitu-

tional liberty is above all price. Already, our example has produced a marked influence on other nations. And, if we are but faithful to the principles of the great fathers and founders of our government—to the constitution, as the bond. of our Union, and the best guarantor of our rights, we shall go on "conquering and to conquer," till the whole earth shall benignly feel the effects of our example. On the other hand, if, from an unhallowed lust of territorial acquisition, and a specious zeal for the propagation of free principles, we become embroiled in dishonorable wars, the aid of prophecy is not needed to announce, with sad certainty, that the sun of the republic will go down in blood, and that the end must be, the establishment of that most abhorred of all forms of government—a military despotism.

I may be allowed further to remark, that while upon the evidence before me, and the law, which must govern my action, I have no hesitancy in adopting the conclusion that these defendants must be discharged, I am not insensible to the fact, that some of the developments made in the progress of this examination are of a character suited to attract public attention to them. These have been adverted to, and commented upon, by the counsel for the prosecution, with great impressiveness and force. I can not concur with them in the position they urge, that the evidence shows there was the beginning of a military movement or organization, having an immediate reference to the invasion of Ireland, and bringing the defendants within the penalties and prohibitions of the statute. Whatever ulterior purposes they may have had in view, there is a lack of evidence to prove any overt act necessary to constitute the offense charged upon them. Yet, the views and suggestions of counsel, in reference to some of the aspects of this case, are certainly entitled to great consideration. It is true beyond a question, that strenuous and concerted efforts have been made in several of the states of the Union to organize the Irish population into clubs, the members of which are bound by a solemn oath or pledge not to reveal their proceedings, or under any circumstances to give evidence against those who are initiated. Already a national convention, consisting of delegates from these clubs, has been held in the city of New York. The avowed purpose of these movements, I am aware, is to produce unity and harmony of feeling among Irishmen, and prepare them for decisive action in the establishment of the independence of Ireland, in the event of a rupture of the present peaceful relations existing between this country and Great Britain. And doubtless, from a motive of this kind, many Irishmen, who, as adopted citizens of the United States, are loyal in feeling to our government and institutions, have given their sanction to, and aided in, these movements.

Would it not be well for such to pause, and seriously inquire, whether great mischief may not be concealed beneath this plausible assumption, and whether there may not be those who are laboring to produce excitement on this subject, who have less at heart the restoration of Ireland's liberties, than the promotion of their own interested views? Suppose it be true, as averred, that there is no intention to violate our neutrality laws, or compromit the peace of this country; yet, is there not reason for the apprehension that these agitations will produce, as their results, hostile collisions between this country and Great Britain? Can it be otherwise, than that these constant and exciting appeals to the national animosities and religious prejudices of a portion of the Irish population of this country. are suited in their tendency, if not in their design, to involve us in the bloody conflicts of war? I censure no Irishman for sympathizing with his native land, and ardently desiring the restoration of the rights of its people; but with all candor and kindness, I would suggest that these feelings ought not to be indulged at the hazard of the interests and peace of the country of his adoption. That country has freely conferred on all foreigners the rights of citizenship, and extends to them the guaranties of its constitution and laws. In return for these privileges, may it not reasonably be insisted they shall in all respects be loyal to our government? There can be no such thing as a divided national allegiance. The obligations of citizenship can not exist in favor of different nationalities at the same time. The foreigner who takes the oath of fidelity to our government necessarily renounces his allegiance to all others; and the obligation thereby incurred abides upon him so long as he remains within the limits of the country, and enjoys the protection of its laws. And it is an obligation that is paramount to all others, and demands of him who assumes it a course of conduct that shall be free from the suspicion of unfriendliness to the institutions and interests of the country, which he is solemnly pledged to defend.

In closing, I have only to remark, that it is in proof that several of these defendants have been long residents of this city, and occupy a highly respectable standing in this community. I should most reluctantly adopt the conclusion, that in the transactions in which they have been implicated, they were moved by any design to violate the laws of the country, or entertained any purpose inconsistent with their duty and obligation to it, as adopted citizens. I trust there will be no future developments, which will present the charge, from which they are now relieved by the decision of this court, in any different legal aspect from that which it now assumes. But, I may remind them, as already intimated, the order for their discharge from this complaint, will be no bar to its re-investigation, if, in the progress of events, such a course should be deemed necessary. The defendants are discharged.